**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 14-62697-CIV-SCOLA/OTAZO-REYES**

GATEARM TECHNOLOGIES, INC.,
a Florida corporation,

      Plaintiff,

v.

ACCESS MASTERS, LLC, a Florida
limited liability company,
BLACKSKY TECHNOLOGIES, INC.,
a Florida corporation, and
GATEARMS.COM, LLC,

      Defendants.
_____/

**REPORT AND RECOMMENDATION**

THIS CAUSE came before the Court upon Plaintiff Gatearm Technologies, Inc.'s ("Plaintiff" or "Gatearm") Motion to Re-Open, for an Order to Show Cause Why Defendants Should not be Held in Contempt, and to Enforce the Consent Judgment (hereafter, "Motion to Reopen," "Motion for Contempt," and "Motion to Enforce") [D.E. 56 & 59].[1]  This matter was referred to the undersigned pursuant to 28 U.S.C. § 636 by the Honorable Robert N. Scola, Jr., United States District Judge [D.E. 74].  The Motion to Reopen was implicitly GRANTED when the undersigned held a status conference on April 19, 2017 and prescribed a schedule for the initial phase of the reopened proceedings.  See Order [D.E. 78].  As to the Motion for Contempt, the undersigned respectfully recommends that it be DENIED for the reasons stated below.  The

---

[1] The document filed at D.E. 59 on December 5, 2016 is a redacted, non-sealed version of the document filed under seal at D.E. 56 on November 15, 2016.

undersigned further recommends that, absent a finding of contempt, the Motion to Enforce also be DENIED.

## PROCEDURAL BACKGROUND

Plaintiff commenced this action on November 26, 2014 with the filing of a Complaint for Patent Infringement ("Complaint") against Defendants Access Masters, LLC ("Access Masters") and BlackSky Technologies, Inc. ("BlackSky").  See Compl. [D.E. 1].

On July 10, 2015, the Court stayed the action pending the United States Patent and Trademark Office's ("USPTO") reexamination of the patent-in-suit, namely, U.S. Patent No. 8,845,125 ("the '125 Patent").  See Order Granting Motion to Stay Pending Patent Office Reexamination [D.E. 19].  The Court administratively closed the case pending the USPTO's reexamination.  Id.

On September 17, 2015, Plaintiff notified the Court that the USPTO's reexamination had been completed and stated its intention to amend the Complaint.  See Plaintiff's Notification to the Court of Completion of Ex Parte Re-Examination and Intention to Amend Complaint to Include an About to Issue Second Patent (hereafter, "Notification") [D.E. 20].  Plaintiff attached to its Notification the USPTO's Ex Parte Reexamination Certificate for the '125 Patent (hereafter, "Reexamination Certificate"), which shows the amendments to the '125 Patent resulting from the reexamination [D.E. 20-1 at 3].

On September 21, 2015, the Court directed the Clerk of Court to reopen the case and set a deadline of September 29, 2015 for Plaintiff to amend the Complaint.  See Paperless Order [D.E. 21]; Amended Complaint [D.E. 23].  Thereafter, the Court granted Plaintiff leave to file a Second Amended Complaint by January 8, 2016 [D.E. 32, 35].

Pursuant to the Court's Scheduling Order entered on November 24, 2015 [D.E. 30],

Plaintiff served its infringement contentions on December 7, 2015.  See Plaintiff's Disclosure of Asserted Claims and Infringement Contentions [D.E. 128-1].

On January 6, 2016, Plaintiff filed its Second Amended Complaint for Patent Infringement ("Second Amended Complaint"), asserting two patent infringement claims against Access Masters, BlackSky and GATEARMS.COM, LLC ("GATEARMS.COM") (collectively, "Defendants").  See Second Am. Compl. [D.E. 36].  One of the claims related to the '125 Patent and the second one related to U.S. Patent No. 9,157,200 ("the '200 Patent").  Id. at 3-8.  Both patents are entitled "Vehicle Barrier System with Illuminating Gate Arm and Method."  Id. ¶¶ 11, 30.  Plaintiff alleged that Access Masters and BlackSky competed with it in the marketing and distribution of home and commercial security products; and that BlackSky and GATEARMS.COM were the distributors of Access Masters' products, including an allegedly infringing light-emitting diode ("LED") arm for a gate (the "Accused Product").  Id. ¶¶ 9, 12.

On January 7, 2016, also pursuant to the Court's Scheduling Order [D.E. 30], Defendants served their Non-Infringement, Unenforceability, and Invalidity Contentions [D.E. 175-21].

On January 20, 2016, Defendants filed their Answer and Affirmative Defenses to the Second Amended Complaint and Counterclaim [D.E. 40].  In their Counterclaim, Defendants sought declaratory judgments of invalidity and non-infringement with respect to both the '125 Patent (as originally constituted and as modified by the USPTO's Reexamination Certificate) and the '200 Patent.  Id. at 9-12.

On March 11, 2016, the parties settled the case at mediation and executed a Settlement Agreement.  See Mediator's Report [D.E. 52]; Settlement Agreement [D.E. 172-12].  On March 29, 2016, the Court entered a Consent Decree providing that:

1.      Effective five months from the Court's entry of this Order, each Defendant, on behalf of itself and its officers, agents, servants,

employees, directors, representatives, successors-in-interest, and all persons, firms or entities acting in concert or participating with them, are permanently enjoined and restrained from manufacturing, advertising, marketing, distributing, selling, offering to sell, importing or exporting the accused "LED Arm for a Gate" or any vehicle barrier system with an illuminating gate arm that would infringe any valid and enforceable claim of U.S. Patent No. 8,845,125 or 9,157,200.

2.      U.S. Patent No. 8,845,125 and U.S. Patent No. 9,157,200, owned by GATEARM TECHNOLOGIES, INC., are valid.

3.      All claims and counterclaims set forth in the Complaint and Counterclaims entered in this action are hereby dismissed with prejudice, with each party to bear its own fees and costs.

4.      The Court retains jurisdiction to enforce the concurrent Settlement Agreement between the parties.

See Consent Decree [D.E. 53].  In its Motion for Contempt, Plaintiff argues that Defendants have violated the Consent Decree and the Settlement Agreement by releasing a new product under an ostensible new design that is not "colorably different" from the Accused Product.  See Motion for Contempt [D.E. 59 at 2].[2]

Initially, the parties agreed that the first step to be undertaken in connection with the Motion for Contempt was the construction of two instances of claim language in the '125 Patent and the '200 Patent that were in dispute.   As a result, the undersigned conducted a *Markman* hearing on August 2, 2017 and thereafter issued a claims construction Report and Recommendation, which the Court adopted [D.E. 94, 95, 99, 101].  Following are several drawings showing embodiments of the '125 Patent that are useful in visualizing Plaintiff's product and the claims construction rulings made after the *Markman* hearing:

---

[2]  See Applicable Law, *infra*, for a discussion of the "colorable differences" contempt inquiry in patent cases.



FIGURE 1



FIGURE 3



FIGURE 6



FIGURE 7

See '125 Patent [D.E. 86-2 at 3-5].  Figures 6 and 7 are particularly relevant to the Court's claims

construction Order:

| Claim language | Construction |
|---|---|
| "first upper sidewall including a terminating end" | The upper half of the first side surface, extending from the convex top to its terminal end located in the first opening. |
| "first lower sidewall including a terminating end" | The lower half of the first side surface, extending from the convex bottom to its terminal end located in the first opening. |

See Order Granting Unopposed Motion to Amend [D.E. 101].

After the *Markman* proceedings were completed, the undersigned held a status conference

and prescribed a deadline of January 31, 2019 for the parties to complete all discovery, including

expert discovery, on the issue of infringement [D.E. 107, 108].  Thereafter, the undersigned held

several hearings to resolve the parties' discovery disputes [D.E. 125, 130, 141].

Finally, the undersigned held an Evidentiary Hearing on the Motion for Contempt on May

13-14, 2019 (hereafter, "Evidentiary Hearing") [D.E. 170-71].  Thereafter, Defendants filed a

Motion to Reopen the Record of the Evidentiary Hearing and/or for a Partial New Trial and/or for

Alternate Equitable Relief (hereafter, "Motion for New Trial") [D.E. 177].  On September 16,

2019, the undersigned granted the Motion for New Trial and allowed the parties to supplement the

record of the Evidentiary Hearing.  See Order [D.E. 187].  The undersigned also directed the parties

to submit Proposed Findings of Fact and Conclusions of Law based on the entire record of the Evidentiary Hearing, as supplemented.  Id.  The record supplementation and briefing have been completed [D.E. 177-1, 188, 194-95].  Therefore, the Motion for Contempt and the Motion to Enforce are ripe for ruling.

## APPLICABLE LAW

"The criteria for adjudicating a violation of a prohibition against continued infringement by a party whose products have already been adjudged to be infringing is a matter of Federal Circuit law."  TiVo Inc. v. Echostar Corp., 646 F.3d 869, 881 (Fed. Cir. 2011).  "The Supreme Court has cautioned that contempt 'is a severe remedy, and should not be resorted to where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct.'"  Id. at 881-82 (citing Cal. Artificial Stone Paving Co. v. Molitor, 113 U.S. 609, 618 (1885); MAC Corp. of Am. v. Williams Patent Crusher & Pulverizer Co., 767 F.2d 882, 885 (Fed. Cir. 1985)).

The contempt "inquiry in patent cases [i]s one of colorable differences between the newly accused product and the adjudged infringing product."  Id. at 882 (citing Abbott Labs. v. TorPharm, Inc., 503 F.3d 1372, 1380 n.3 (Fed. Cir. 2007)).  "Thus, the party seeking to enforce the injunction must prove both that the newly accused product is not more than colorably different from the product found to infringe and that the newly accused product actually infringes."  Id.

The TiVo court further explained:

The primary question on contempt should be whether the newly accused product is so different from the product previously found to infringe that it raises "a fair ground of doubt as to the wrongfulness of the defendant's conduct."  The analysis must focus not on differences between randomly chosen features of the product found to infringe in the earlier infringement trial and the newly accused product, but on those aspects of the accused product that were previously alleged to be, and were a basis for, the prior finding of infringement, and the modified features of the newly accused product. Specifically, one should focus on those elements of the adjudged infringing products that the patentee previously contended, and proved, satisfy specific limitations of the asserted claims. Where one or more of those

> elements previously found to infringe has been modified, or removed, the court must make an inquiry into whether that modification is significant. If those differences between the old and new elements are significant, the newly accused product as a whole shall be deemed more than colorably different from the adjudged infringing one, and the inquiry into whether the newly accused product actually infringes is irrelevant.

Id. (citations omitted).

Thus, the actual infringement inquiry need not proceed if the newly accused product is found to be "more than colorably different from the adjudged infringing one." Id. at 882.  In such cases, "[c]ontempt is [] inappropriate."  Id.  (quoting Arbek Mfg., Inc. v. Moazzam, 55 F.3d 1567, 1570 (Fed. Cir. 1995) ("[T]he modifying party generally deserves the opportunity to litigate the infringement questions at a new trial.")).

"Conversely, when a court concludes that there are no more than colorable differences between the adjudged infringing product and modified product, a finding that the newly accused product continues to infringe the relevant claims is additionally essential for a violation of an injunction against infringement." Id. at 883.  The TiVo court added:

> Thus, the court is required to evaluate the modified elements of the newly accused product against the asserted claim, on a limitation by limitation basis, to ensure that each limitation continues to be met. In making this infringement evaluation, out of fairness, the district court is bound by any prior claim construction that it had performed in the case. The patentee bears the burden of proving violation of the injunction by clear and convincing evidence, a burden that applies to both infringement and colorable differences.

Id.

## FINDINGS OF FACT

### I.   Evidentiary Submissions

1.  The following witnesses testified at the Evidentiary Hearing: BlackSky's Principal Jonathan Brinkman ("Mr. Brinkman") via deposition excerpts proffered by Plaintiff, and via live testimony in Defendants' case; Access Masters' Principal Michael Pikman ("Mr. Pikman") via

deposition excerpts proffered by Plaintiff, and via live testimony in Defendants' case;[3] Plaintiff's

Expert James G. Rice, Ph.D. ("Dr. Rice"); and Defendants' Expert Steven Michael Tipton, Ph.D.

("Dr. Tipton").[4]  See Transcript of Civil Hearing, May 13, 2019 (hereafter, "5/13/19 Transcript")

[D.E. 180]; Transcript of Civil Hearing, May 14, 2019 (hereafter, "5/14/19 Transcript") [D.E. 181].

2.  The following documents were admitted into evidence at the Evidentiary Hearing:

Plaintiff's Exhibits P1, P2, P3, P3-1, P4, P5, P6, P7, P8, P9, P10, P13, P14, P16, P17, P24, P25,

P26, P28, P29,[5] P32, P33,[6] P35, P36, P37, P38, P39, P40, and P41; and Defendants' Exhibits 7A,

7B, 10–11, 12A, 12B, 12C, 13, 18, 24–25, and 27–30.

3.  The following documents were admitted as a supplement to the record of the Evidentiary

Hearing pursuant to the undersigned's Order dated September 16, 2019 [D.E. 187]: Defendants'

Exhibit 35 [D.E. 177-1]; and Plaintiff's Exhibits P42, P43, P44, P45, P46, P47, P48, P49, P50,

P51, P52, and P53 [D.E. 188].

## II.  **Stipulated Facts**[7]

4.  According to the Second Amended Complaint (ECF No. 36), this case involves claims of

patent infringement of two U.S. Patents, 8,845,125 (the '125 patent) and 9,157,200 (the '200

patent) [D.E. 99, page 1].

---

[3]  Mr. Brinkman's and Mr. Pikman's deposition excerpts were proffered subject to Defendants' objections [D.E. 168-2 & 168-1].

[4]  Dr. Tipton's expert testimony was presented subject to Plaintiff's Motion *in Limine* to Exclude the Report and Testimony of Defendants' Expert Dr. Steven M. Tipton under *Daubert* and the Federal Rules of Evidence 702 and 703, for Relying on an Improper Methodology and as Being Inherently Unreliable (hereafter, "*Daubert* Motion") [D.E. 147].  The *Daubert* Motion is addressed *infra*.

[5]  The undersigned overruled Defendants' objection to the admission of Pl.'s Ex. P29.  See generally 5/13/19 Transcript [D.E. 180 at 55-59].

[6]  Plaintiff's Exhibits P32 and P33 are the transcripts of Mr. Brinkman's and Mr. Pikman's depositions, respectively, which are subject to Defendants' objections [D.E. 168-2 & 168-1].

[7]  See Stipulated Facts Section in the parties' Joint Statement of Stipulated and Disputed Facts and Legal Issues (hereafter, "Joint Statement") [D.E. 128 at 4].  The entire Joint Statement [D.E. 128] was admitted at the Evidentiary Hearing as Pl.'s Ex. P41, including "Plaintiff's Disclosure of Asserted Claims and Infringement Contentions."  See Pl.'s Ex. P41, Exhibit A; D.E. 128-1.

5. On March 11, 2016, the parties entered into a Settlement Agreement and a proposed Consent Decree.

6. On March 29, 2016, the Court entered the Consent Decree, specifying that each Defendant, on behalf of itself and its officers, agents, servants, employees, directors, representatives, successors-in-interest, and all persons, firms or entities acting in concert or participating with them, are permanently enjoined and restrained from manufacturing, advertising, marketing, distributing, selling, offering to sell, importing or exporting the originally accused "LED Arm for a Gate" or any vehicle barrier system with an illuminating gate arm that would infringe any valid and enforceable claim of U.S. Patent Nos. 8,845,125 or 9,157,200. [D.E. 53, at 1].

7. Defendants are enjoined from manufacturing, advertising, marketing, distributing, selling, offering to sell, importing or exporting the originally accused "LED Arm for a Gate" or any colorable imitation thereof.

8. Plaintiff filed a Motion to Re-Open, for an Order to Show Cause Why Defendants Should Not Be Held in Contempt, and to Enforce the Consent Judgment.

## III. **Testimonial Evidence**

### A. *Mr. Brinkman's testimony via deposition excerpts*[8]

9. Mr. Brinkman identified several of Plaintiff's Exhibits as follows:

Pl.'s Ex. P1 - aluminum portion of Mr. Pikman's gate arm that was the subject of Plaintiff's lawsuit.[9]

Pl.'s Ex. P2 - sample of portion of light strip used with full length version of Pl.'s Ex. P1.

Pl.'s Ex. P3 - installation kit for gate arm.

Pl.'s Ex. P4 - Consent Decree entered in the case.

---

[8] See Deposition of Jonathan Brinkman, February 11, 2019 (hereafter, "Brinkman Depo."), Pl.'s Ex. 32. Mr. Brinkman was deposed as BlackSky's corporate representative, pursuant to Fed. R. Civ. P. 30(b)(6). Id. at 4.
[9] Pl.'s Ex. P1 is a truncated version of the actual aluminum beam.

10. Defendants' gate arm's aluminum was changed as a result of the Consent Decree. Additionally, the LED strips continued to be improved and technical changes were made to the product unrelated to the aluminum.

11. On BlackSky's website (Pl.'s Ex. P5), the statement "[o]ur patented gate arms have LED lighting built into the gate arm" refers only to design patent U.S. D707851 (Pl.'s Ex. P6), owned by Mr. Pikman. BlackSky no longer sells the gate arm represented by Pl.'s Ex. P1.[10]

12. Pl.'s Ex. P7 represents the revision created by Defendants as a result of the Settlement Agreement.[11]

13. The statement in BlackSky's website (Pl.'s Ex. P5) that "[o]ur patented gate arms have LED lighting built into the gate arm" is a reference to the aluminum gate arm having the shape of Pl.'s Ex. P7.

14. Eastern Metal Supply sells the aluminum gate arms to Mr. Pikman, who sells them to BlackSky, who equips them with the LED light strips and electrical controller and other pieces. BlackSky provides the outfitted gate arms to distributors, who sell them to professional installers for use at, predominantly, gated communities. The installers are the source of BlackSky's customer base.

15. On March 14, 2016 and April 6, 2016, Mr. Brinkman sent emails to BlackSky's distributors (Pl.'s Ex. P8) as a result of signing the Consent Decree on March 11, 2016.

16. The emails informed the distributors of the modifications to the LED barrier gate arm. One was to change the shape of the aluminum and one related to the light coming out. However, the emails did not discuss the modifications; they simply said a consent decree had been agreed upon.

---

[10] The undersigned admitted Pl.'s Exs. P5 and P6 but limited them to admissions as to the design patent.
[11] Pl.'s Ex. P7 is also a truncated version of the actual aluminum beam.

17. In Mr. Brinkman's opinion, the product represented by Pl.'s P7 honors the Consent Decree because the Consent Decree required Defendants to change the shape of the aluminum in order to continue selling gate arms and Defendants changed the shape of the outer aluminum from Pl.'s Ex. 1 to Pl.'s Ex. 7.

18. Mr. Brinkman acknowledged that the March 14, 2016 and April 6, 2016 emails stated, "The outward visual appearance will be virtually identical to the current design."  See Pl.'s Ex. P8.

19. Access Masters' answer to Plaintiff's First Interrogatory No. 1 states: "Since June 2016, ACCESS MASTERS has manufactured a barrier gate design, described to customers as '12ft LED Arm' and '15ft LED Arm,' there is no other model name or product number."  See Pl.'s Ex. P9. This was the product that BlackSky obtained from Access Masters.

20. BlackSky's answer to Plaintiff's First Interrogatory No. 1 states: "A single model of barrier gate design, identified as 'barrier arm design version 2.0' has been manufactured and sold since June 2016.  This model is manufactured by Access Masters, LLC."  See Pl.'s Ex. P10.  This is the barrier gate arm obtained from Access Masters and equipped with LED lights and an electrical kit by BlackSky.

21. Mr. Brinkman identified Pl.'s Ex. P13 as the gate arm brochure.[12]

22. Mr. Brinkman identified Pl.'s Ex. P14 as BlackSky's older installation manual, as it appeared on BlackSky's website, with a revision date of February 2018.

23. The installation manual (Pl.'s Ex. P3-1) included in the gate arm installation kit (Pl.'s Ex. 3) is also an older version, dating back to November 2018.  BlackSky has more recent installation manuals.

---

[12]  The undersigned limited the admissibility of this exhibit in a similar fashion as Pl.'s Exs. P5 and P6.

24. Mr. Brinkman was the primary author of the installation manuals represented by Pl.'s Ex. P3-1 and Pl.'s Ex. P14, with input from BlackSky employees.

**B.  *Mr. Pikman's testimony via deposition excerpts*[13]**

25. BlackSky and GATEARMS.COM are the distribution centers for Access Masters' LED gate arms.

26. The truncated gate arm represented by Pl.'s Ex. P1 is part of an Access Masters LED gate arm.

27. The marking "D707,8515" on Pl.'s Ex. P1 corresponds to a design patent owned by Mr. Pikman.[14]

28. Access Masters does not supply its gate arms to any distributors other than GATEARMS.COM's distributors, but it installs complete gate arm packages at communities that are its direct customers.

29. Mr. Pikman did not recall the substance of a conversation he had with Mr. Brinkman a long time prior regarding whether the Access Masters gate arms were covered by a U.S. patent.

30. Mr. Pikman did recall a conversation with Mr. Brinkman regarding exclusivity, but he affirmed that Mr. Brinkman is the exclusive distributor of Access Masters' gate arms.

31. According to Mr. Pikman there are three versions of the Access Masters gate arm, represented as follows:

> Version # 1 – Pl.'s Ex. P6 (design patent)
> Version # 2 – Pl.'s Ex. P1
> Version # 3 – Pl.'s Ex. P7

---

[13]  See Deposition of Michael Pikman, February 12, 2019 (hereafter, "Pikman Depo."), Pl.'s Ex. P33.  Mr. Pikman was deposed as Access Masters' corporate representative, pursuant to Fed. R. Civ. P. 30(b)(6).  Id. at 4-5.

[14]  The undersigned applied to all facts regarding the design patent the same ruling as the one made for Pl.'s Exs. P5 and P6.

32. Mr. Pikman does not know whether all three versions are covered by the design patent and has no idea as to what the design patent covers.

33. Mr. Pikman started working on Version # 3 a few days after the parties entered into the Settlement Agreement.  He did not have the idea for that version prior to that time.

34. The first change Mr. Pikman made was to remove the fins from the outside wall of the gate arm to the channel; so that, if the channel is taken out there will be no fins in the gate arm.  In Pl.'s Ex. P1 the fins are part of the outside wall; in Pl.'s Ex. P7 they are part of the channel.

35. In Pl.'s Ex. P1, the LED strip is concealed, in that it is part of the gate arm; it is inserted in the gate arm by pulling it through; it is retained in the gate arm by sitting inside the channel; and it doesn't fall out of the channel because it is held in place by the outside wall of the gate arm.

36. The channel in Pl.'s Ex. P1 where the LED strip sits has three walls, with an opening for the light to shine through; and the LED strip does not fall out.

37. Pl.'s Ex. P7 has a channel.  The LED strip is retained by sitting in the channel, which has an opening for the light to shine out.  The LED strip will not fall out of that channel because it is a complete channel with five walls.

38. Mr. Pikman, as sole inventor, filed a patent application for the configurations represented by Pl.'s Ex. P7.  A provisional application was filed on May 17, 2016 and a non-provisional one was filed on February 4, 2017 (Pl.'s Ex. P16).  The non-provisional patent application was assigned application number 15/424,782 and was for a "Barrier Gate Arm with Recessed Light Housing" (hereafter, "'782 Patent Application").  See Pl.'s Ex. P16 at 1.[15]

39. According to Mr. Pikman, the novel feature claimed in the May 17, 2016 provisional patent

---

[15]  Additional portions of the '782 Patent Application were admitted as Pl.'s Exs. P35, P36.  Portions of Mr. Pikman's non-provisional patent application number 15/889,195 (hereafter, "'195 Patent Application") were admitted as P37, P38, P39 and P40.

application was recessed light housing; and his understanding of the purpose of filing this patent application was to protect his design so he could make his gate arms.[16]

40. According to Mr. Pikman, the differences between Pl.'s Ex. P7 and Pl.'s Ex. P1 are that: the fins are below the outside surface of the gate arm; the channel is recessed deeper; the channel is smaller; and the LED strip used in Pl.'s Ex. P1 is wider than the one used in Pl.'s Ex. P7.

41. Mr. Pikman identified Pl.'s Ex. P17 as a portion of the Computer Assisted Design ("CAD") file for the gate arm represented by Pl.'s Ex. P7.

42. Mr. Pikman's understanding that Pl.'s Ex. P7 does not violate the Consent Decree is based on the following reason: the fins are not part of the gate arm's outside wall; they are part of a channel and they recess from the surface. These are all the differences between the LED arm referenced in the Consent Decree and the gate arm designated as version 2.0 by GATEARM.COM.

*C. Dr. Rice's expert testimony*

43. Dr. Rice was qualified as an expert in mechanical engineering and patent-related matters.

44. Dr. Rice prepared an expert report regarding infringement of the '125 Patent and the '200 Patent. His analysis consisted of examining the parties' agreement to determine whether Defendants' new design was substantially the same as their original design and thus infringed the '125 Patent and the '200 Patent. Specifically, Dr. Rice considered whether the new design (Pl.'s Ex. P7) is colorably different from the original design (Pl.'s Ex. P1) in light of the terms of the parties' agreement and the Court's claims construction order.

45. Dr. Rice concluded that there is absolutely no significant difference between the two designs from the viewpoint of an infringement analysis. The Court's claims construction was the

---

[16] The undersigned sustains Defendants' objections to this portion of Mr. Pikman's deposition testimony [D.E. 168-1 at 4, first entry] as being beyond the scope of permitted discovery into the colorable variation issue.

15

fundamental aspect of this opinion.

46. The key portion of the Court's claims construction for Dr. Rice was that the terminal end is located in the first opening; and he concluded that in both designs the terminal end does terminate in the first opening.  According to Dr. Rice, the first opening is quite clearly defined in the specification of the patent as being defined by the upper and lower horizontal portions and the rear portion of the opening.

47. In Dr. Rice's view, the novel feature of the '125 Patent and the '200 Patent is the cradle for the LED strip and the various terms used to describe what restrains the LED light strip within the opening; namely, the two terminal ends, the lips, or the fins.  According to Dr. Rice, in all cases it is essentially the same structural feature.

48. Dr. Rice noted that there is a slight difference between the two designs represented by Pl.'s Ex. P1 and Pl.'s Ex. P7 in that, in the latter, the fins are slightly shifted inward into the opening; but he concluded that this does not constitute a substantial difference between the two designs. According to Dr. Rice, a "C"-shaped cradle, whose function is to retain the LED strip in such a manner that the strip is easily removable and replaceable, is present in both devices.  Dr. Rice further opined that the lips or fins component of the "C"-shaped cradle is also present in both devices.

49. According to Dr. Rice, the Court's claims construction states that the terminal ends should terminate within the opening, as defined in the specification of the patents.  Dr. Rice opined that both the original and the new design meet this requirement.

50. Dr. Rice reiterated his conclusion that there is not a significant difference between the design represented by Pl.'s Ex. P1 and Pl.'s Ex. P7 and that both designs infringe on Plaintiff's patents because they both meet the limitations set forth in the patents' claim one.

51. Dr. Rice relied on the following demonstrative exhibit, entitled "New Design with Shifted Position of the Integrally Formed Sidewall Terminal Ends" (hereafter, "Ex. P-Demonstrative"),  to illustrate that the new design is the same as the original design and that the only difference is that the terminal end has been shifted slightly inward.



See Ex. P-Demonstrative [D.E. 175-31].

52. According to Dr. Rice, the way in which both designs infringe Plaintiff's patents is as follows:

> Well, basically the lip or the terminal end on both designs serves to retain the LED light strip within the channel.

> And, so they both function in an identical manner there is no difference. The only difference is the terminal end has been shifted slightly inward. But it still serves exactly the same function in exactly the same manner.

See 5/13/19 Transcript [D.E. 180 at 79].

53. With regard to the structure of the "C"-shaped channel, when comparing the original design to the new design, Dr. Rice stated:

> Well, a key factor is it is a continuous structure. In other words, this goes down and it shifts slightly inward. It is a continuous structure there is no difference. One continues straight down, one continues with a slight shift inward in the radial direction.

Id. at 80.

54. Applying the foregoing observations, Dr. Rice opined that both designs infringe on Plaintiff's patents.

55. Dr. Rice testified that his methodology involved a two-part test: "one was to determine whether there was significant difference between the original design and the new design;" and the second part, after he decided that there was not a significant difference, was an infringement analysis. Id. at 81.

56. At the close of Dr. Rice's direct testimony, the undersigned admitted Pl.'s Ex. P24 (the '125 Patent) and Pl.'s Ex. P26 (the '200 Patent).

57. On cross-examination, Dr. Rice acknowledged that there is a slight geometric difference between a "U"-shaped channel and a "C"-shaped channel, as depicted in Def.'s Ex. 30 (Def.'s Ex. 23 to Dr. Rice's deposition).[17]

58. Dr. Rice also acknowledged that a patent claim cannot cover something that was given up in order to obtain the patent, but he did not take that into account when conducting his analysis.

---

[17] The undersigned limited the admission of this exhibit to its relation to Dr. Rice's testimony that the two shapes are different.

59. Dr. Rice also acknowledged that he did not take into account differences in the height and depth of the interior channel between Defendants' original and new designs.  In his deposition, however, Dr. Rice had testified that the height and width of the inset channel are the same in both designs and he agreed with that conclusion at the evidentiary hearing.

60. Dr. Rice acknowledged that he read the Court's claims construction as stating that the ends terminate "within the opening, not partially or wholly.  Simply within the opening."  See 5/13/20 Transcript [D.E. 180 at 103].  In his expert report, however, Dr. Rice used the word "partially" when referring to the terminating ends.  See Dr. Rice's Expert Report [D.E. 128-4 ¶ 6] ("A key requirement is that the 'terminating ends' of the upper and lower sidewalls terminate 'partially within a first opening'. . .").

61. Dr. Rice acknowledged that the Settlement Agreement states that "the parties agreed that if the ends did not terminate partially within the opening, there would be no infringement."  See 5/13/20 Transcript [D.E. 180 at 105] (citing Settlement Agreement [D.E. 172-12 ¶ 4]).

62. Dr. Rice acknowledged and agreed with the following testimony from his deposition: "[T]hose ends terminate within the opening of the channel" and "the ends are completely within what is defined as the first opening in the claims."  Id. at 106 (citing Dr. Rice's deposition at p. 33 ln. 17).  Although Defendants' counsel provided no context for the foregoing citation, a review of the preceding portion of Dr. Rice's deposition transcript [D.E. 150-8 at 30-32] reveals that the testimony relates to Figure 8 in the '125 Patent, which is reproduced below from Pl.'s Ex. P24.



FIG. 8

FIG. 9

See Pl.'s Ex. 24.

63. On re-direct examination, Dr. Rice explained that he did not consider the height and width of the channel because he did not deem them to be relevant.

64. Dr. Rice also stated that he understood the Court's claims construction.

65. Returning to Ex. P-Demonstrative, Dr. Rice identified the opening in the original design as the space between the blue lines rather than the space between the red lines.

66. For the new design shown on Ex. P-Demonstrative, Dr. Rice identified the upper half and lower half of the first side surface as continuous structures indicated by the red lines, respectively.

### D.  Mr. Brinkman's testimony

67. Mr. Brinkman has an educational background in accounting and computer science and has work experience in information technology.  He founded BlackSky in 2008 and has developed software and hardware for gated communities.

68. Mr. Brinkman met Mr. Pikman at a trade show and then arranged for the representation of Mr. Pikman's lighted gate arm.  Thereafter, the two of them began developing their product.  There have been twelve variations of the product in the context of the hardware and software.  However, when Plaintiff sued Defendants for patent infringement in this action, the suit was against the first form of gate arm that BlackSky had sold.

69.  As a result of the Settlement Agreement, Defendants changed the design of the gate arm's aluminum.  Thus, Pl.'s Ex. P1 represents the first variation of the gate arm sold by BlackSky and Pl.'s Ex. P7 represents the second variation, which is the current one.

70. BlackSky purchases the aluminum for the gate arm from Access Masters and obtains the LED strips directly from China.

71. BlackSky's customers are wholesale distributors located in the United States and throughout the world.

72. The LED strips that Mr. Pikman was using for his product were of inferior quality. BlackSky re-engineered the LED strip to be more durable and more appropriate for a barrier gate arm setting.

73. Prior to the Settlement Agreement, BlackSky had made changes to the LED strip that affected its physical shape.  BlackSky made additional changes after the Settlement Agreement.

74. BlackSky initially encountered problems inserting the LED strip into the gate arm because the track was too small, which required the use of lubricant to make the track or channel slippery. That problem was eliminated with the design represented by Pl.'s Ex. P7 because the channel was enlarged to an appropriate size for the new LED strip.

75. The changes made to the channel are as follows: the new channel is twenty percent wider than the original one and is also almost double in height; the aluminum used for the walls of the gate arm is less thick, that is, lighter; the opening for the LED strip's light is wider so that more light can escape from the channel; and the retaining fins are inside the channel and reflect light.

76. At the conclusion of Mr. Brinkman's direct examination, the undersigned admitted the Settlement Agreement as Def.'s Ex. 28.

77. On cross-examination, Mr. Brinkman characterized his March 14, 2016 email to customers (Pl.'s Ex. P8 at 1), in which he stated that the outward visual appearance of the gate arm's new design would be virtually identical to the original one, as a marketing email intended to calm the customers' nerves.

78. Mr. Brinkman acknowledged that the LED strip used for the new design, with some variations, is the same one that was used for the original design.

79. On re-direct examination, Mr. Brinkman explained his statement in the March 14, 2016, email that "[t]he modification will improve the focus of the LED light so it is directed primarily at the driver, rather than fully ambient in 180 degrees as at present" (Pl.'s Ex. P8 at 1), as follows:

> We believed that the new design works better than the old design in that it restricts the emission of light into a specific angle of emission.
>
> So that previously it was emitting light across almost 180 degrees of emission, because the light was so close to the opening. Now, by moving the opening deeper into the channel, we are constraining the light, the angles at which it can exit the aluminum.
>
> So, by constraining the light and by giving it a reflective surface upon which to bounce off on the way out of the channel, we bring more light to the eyes of the driver than the previous design did.

See 5/13/19 Transcript [D.E. 180 at 126].

### E.  Mr. Pikman's testimony

80. Mr. Pikman established Access Masters in Florida in 2007, after working for a gate arm company and owning an automotive repair shop in Philadelphia.

81. Access Masters services gated community operators and gates; and fabricates aluminum gate arms.

82. Mr. Pikman designed the gate arms represented by Pl.'s Exs. P1 and P7, the latter after the Settlement Agreement.

83. According to Mr. Pikman, the changes between Pl.'s Ex. P7 and Pl's. Ex. P1 are that in Pl.'s Ex. P7 the channel is recessed deeper into the gate arm and it is a "C"-shaped channel rather than a "U"-shaped channel (as seen from the side of the gate arm), all of which create better visibility for drivers.

84. Mr. Pikman attempted to obtain a patent for his new design, but he acknowledged that nothing in the USPTO's correspondence references a "C"-shaped channel. Mr. Pikman made some modification to the patent application, which was pending at the time he testified.

85. A communication from the USPTO dated March 24, 2017, states: "Lumsden et al. is silent concerning the upper and lower channel walls extending from terminating ends of the exterior wall." See Def.'s Ex. 7A at 6.[18] The communication from the USPTO then references an elongate visor channel in the Patten patent. Id.

86. Reviewing a drawing from the Patten patent (Def.'s Ex. 24), Mr. Pikman stated that it shows a "C"-shaped channel like Access Masters' new product, represented by Pl.'s Ex. P7. The entire Patten patent was admitted as Def.'s Ex. 10.

87. A communication from the USPTO dated September 5, 2017, states: "Lumsden et al. is silent concerning an elongate visor channel." See Def.'s Ex. 7B at 6. The communication from the USPTO then references an elongate housing in the Nagano patent. Id. The entire Nagano patent was admitted as Def.'s Ex. 11.

88. Mr. Pikman testified as follows regarding Figure 8B in a communication from the USPTO dated September 5, 2018 (Def.'s Ex. 12B), which related to Mr. Pikman's continuation of his patent application: "The channel looks like channel "C" and the fins are inserted deeper into the - - below the surface of the structure." See 5/13/19 Transcript [D.E. 180 at 135]. See also Def.'s Exs. 27 & 13.

89. Mr. Pikman interpreted a communication from the USPTO dated December 26, 2018 (Def.'s Ex. 12C) as "point[ing] out that upper and lower fins are basically into – below the surface

_____

[18] Lumsden is Plaintiff's patent.

of the outside wall." See 5/13/19 Transcript [D.E. 180 at 136].  See also Def.'s Ex. 29.  According

to Mr. Pikman, that configuration generally corresponds to his new product.[19]

90. On cross-examination, Mr. Pikman acknowledged language referring to obviousness in the

USPTO's communications admitted as Def.'s Exs. 7A and 7B.  Mr. Pikman denied that the patent

application referenced in those communications had been abandoned and described its status as

pending.

91. Mr. Pikman expressed no knowledge as to language referring to obviousness in the

USPTO's communications admitted as Def.'s Exs. 12B and 12C.  He reiterated that his patent

application was pending.

### F.  Dr. Tifton's expert testimony

92. Dr. Tifton was qualified as an expert in mechanical engineering.

93. Dr. Tifton identified Def.'s Ex. 15 as Figure 8 in the '125 Patent (Pl.'s Ex. 24).  Dr. Tifton's

testimony relating to this exhibit was stricken.  See 5/14/19 Transcript [D.E. 181 at 155-65].[20]

94. Dr. Tifton interpreted the red and blue lines in the Original Design portion of Ex. P-

Demonstrative, *supra*, as follows: at the top of the drawing, the red line represents the upper side

wall and extends down into the lip or fin that holds the light strip in; the blue line has a horizontal

and a vertical component, and represents both the inset channel side wall and the upper side wall,

which extends into the lip or fin.  A corresponding interpretation applies to the bottom of the

drawing.

95. According to Dr. Tifton, the use of the blue line and the red line to identify the same

component by putting two color lines on the same element is incorrect because one thing cannot

---

[19] Def.'s Ex. 12A was also admitted, but it was not addressed in Mr. Pikman's testimony.
[20] The undersigned reserved ruling on Plaintiff's objection to the admission of Def.'s Ex. 15.  Based on the lack of admissible testimony relating to it, the exhibit is excluded.

be two things.  Specifically, the part called the "lip" or "fin" cannot be both the outer side wall and the channel.

96. Dr. Tifton interpreted the red and blue lines in the New Design portion of Ex. P-Demonstrative, *supra*, as follows: the red line is an illustration of a wall that bends to the left and bends downward and forms a separate fin in the channel to hold the light in; the blue line is the same as in the Original Design portion of Ex. P-Demonstrative; specifically, there is a horizontal piece that turns down and goes into the same fin.

97. According to Dr. Tifton, it makes no sense from an engineering standpoint for the fin to be identified as being two different parts, namely, a red part and a blue part.

98. Dr. Tifton further testified that, when a light strip is recessed, the light comes out better in daylight.

99. On cross-examination, Dr. Tifton testified that, while two separate things can overlap in a general engineering sense, that does not make them the same thing.  They are properly referred to as a system in which two structures overlap.

100.  Dr. Tifton acknowledged having shaded a portion of the channel in Figure 9 of Pl.'s Ex. 24 and labeling the shaded area an "overlap" at the request of Plaintiff's counsel during his deposition; but he testified that, in his opinion, it was not reasonable to do so.

101.  According to Dr. Tifton, his expert report, when viewed in its entirety, covered the differences between Defendants' original product and redesigned product.  Specifically, Dr. Tifton testified that he looked at the representations of the two products in Dr. Rice's expert report in excruciating detail and considered them when writing his own report, but he did not repeat the contents of Dr. Rice's report for the sake of avoiding redundancy.

102. Dr. Tifton further testified that he focused on the new design because that is what he wanted to describe and explain how it was different and that he operated on the premise that Plaintiff's patent covered the original product.

103. On re-direct examination, Dr. Tifton testified that, based on his understanding, Defendants' original product and Plaintiff's patented product were identical, but he acknowledged that a figure in his report omitted the lips that retain the light strip. See 5/14/19 Transcript [D.E. 181 at 184-85]; see also Dr. Tifton's Expert Report Figure 2 at Page 6, reproduced in Plaintiff's *Daubert* Motion [D.E. 147 at 14].

### G.  *Post-Evidentiary Hearing supplemental evidence*

104.  On June 6, 2019, the USPTO issued a Notice of Allowance and Fees Due (hereafter, "Notice") for Mr. Pikman's non-provisional patent application number 15/889,195, titled "Barrier Gate Arm with Recessed Light Housing," filed on February 5, 2018 (hereafter, "'195 Patent"). See Def.'s Ex. 35 [D.E. 177-1].

105.  According to the Notice, the '195 Patent Application was amended by the USPTO examiner with respect to the abstract, the specification, and Claim 1.  Id. at 6-7.

106.  The complete prosecution history for the '195 Patent is contained in Pl.'s Ex. P53 [D.E. 188-12].

107.  The '195 Patent Application was submitted as a continuation in part of the '782 Patent Application.  See Pl.'s Ex. P45 at 4 [D.E. 188-4 at 4].

108.  Portions of the prosecution history for the '195 Patent are reflected in the following exhibits:

Pl.'s Ex. P46 [D.E. 188-5] - 6/8/18 Applicant-Initiated Interview Summary
Pl.'s Ex. P47 [D.E. 188-6] - 6/5/18 Amendments to '195 Patent Application
Pl.'s Ex. P48 [D.E. 188-7] - 11/20/18 Applicant-Initiated Interview Summary
Pl.'s Ex. P49 [D.E. 188-8] - 12/3/18 Amendments to '195 Patent Application

Pl.'s Ex. P50 [D.E. 188-9] - 2/26/19 Applicant-Initiated Interview Summary
Pl.'s Ex. P51 [D.E. 188-10] - 3/26/19 Amendments to '195 Patent Application

109.  The complete prosecution history for the '782 Patent Application, which Mr. Pikman

testified at the Evidentiary Hearing was for the configurations represented by Pl.'s Ex. P7, is

contained in Pl.'s Ex. P52 [D.E. 188-11].

110.  On March 27, 2018, the USPTO issued a Notice of Abandonment with respect to the

'782 Patent Application.  See Pl.'s Ex. P44 [D.E. 188-3].

111.  Portions of the prosecution history for the '782 Patent Application are reflected in the

following exhibits:

Pl.'s Ex. P42 [D.E. 188-1] – 5/30/17 Applicant-Initiated Interview
Pl.'s Ex. P43 [D.E. 188-2] – 6/9/17 Amendments to '782 Patent Application

## **PLAINTIFF'S *DAUBERT* MOTION**

### *1.     Daubert Standard*

Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training,
or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the
trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the
case.

Fed. R. Evid. 702.  A party who seeks to admit expert testimony bears the burden of laying the

proper foundation for its admissibility by a preponderance of the evidence.  Allison v. McGhan

Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999).  Thus, before expert testimony may be admitted

as evidence at trial pursuant to Rule 702 of the Federal Rules of Evidence, the district court must

act as a gatekeeper and screen the proffered evidence.  <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509

U.S. 579, 596-97 (1993).  In the Eleventh Circuit, this gatekeeping function must be performed as

follows:

> [I]n determining the admissibility of expert testimony under Rule 702, [the court
> must] engage in a rigorous three-part inquiry [and] must consider whether: (1) the
> expert is qualified to testify competently regarding the matters he intends to
> address; (2) the methodology by which the expert reaches his conclusions is
> sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and
> (3) the testimony assists the trier of fact, through the application of scientific,
> technical, or specialized expertise, to understand the evidence or to determine a fact
> in issue.

 <u>United States v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing <u>City of Tuscaloosa v.</u>

<u>Harcros Chems., Inc.</u>, 158 F.3d 548, 562 (11th Cir. 1998)).

### 2. *Discussion*

As noted above, Dr. Tifton testified at the Evidentiary Hearing subject to Plaintiff's

*Daubert* Motion [D.E. 147].  Dr. Tifton was qualified as an expert in mechanical engineering at

the Evidentiary Hearing.  <u>See</u> Dr. Tifton's expert testimony, *supra*.  However, Plaintiff argues in

its *Daubert* Motion that Dr. Tifton's expert opinion was based on an incorrect methodology; hence,

it is unreliable and will not assist the Court in its fact-finding mission with respect to the Motion

for Contempt.  <u>See</u> Plaintiff's *Daubert* Motion [D.E. 147 at 8].  Specifically, Plaintiff contends

that Dr. Tifton incorrectly employed a typical patent infringement analysis rather than the analysis

applicable to the Motion for Contempt, which involves a comparison between Defendants' original

gate arm and their new gate arm, to ascertain if there are colorable differences between the two.

<u>See</u> Applicable Law, *supra*.  However, Dr. Tifton testified at the Evidentiary Hearing that his

expert report, when viewed in its entirety, covered the differences between Defendants' original

product and redesigned product.   Moreover, Dr. Tifton testified that he looked at the

representations of the two products in Dr. Rice's expert report in excruciating detail and considered

them when writing his own report, but he did not repeat the contents of Dr. Rice's report for the sake of avoiding redundancy. Dr. Tifton further testified that he focused on the new design because that is what he wanted to describe and explain how it was different and that he operated on the premise that Plaintiff's patent covered the original product. Given Dr. Tifton's testimony, the undersigned does not find it appropriate to strike him as an expert on the grounds advanced by Plaintiff. Therefore, the undersigned DENIES Plaintiff's *Daubert* Motion and gives Dr. Tifton's expert testimony the weight she deems appropriate.

## CONCLUSIONS OF LAW

### 1.  *The Colorable Differences Inquiry*

In accordance with TiVo, the purpose of this inquiry is to determine whether the differences between Defendants' original gate arm (Pl.'s Ex. P1) and new gate arm (Pl.'s Ex. P7) are significant. TiVo, 646 F.3d at 881. If they are, then Pl.'s Ex. P7 is more than colorably different from Pl.'s Ex. P1 and the infringement inquiry becomes irrelevant. Id. at 882.

At an earlier discovery hearing, Plaintiff argued that Mr. Brinkman and Mr. Pikman are persons of ordinary skill in the art. See Transcript of January 10, 2019 Hearing [D.E. 133 at 53] ("The defendant is actually a person of ordinary skill in the art. They're the ones manufacturing and working with these. They know this art. It is their field."); see also id. at 56 ("[A]nd I would pluralize that to principals of -- each defendant has a different principal."). Therefore, the undersigned deems their testimony to be that of persons of ordinary skill in the art and accepts it as such.

At the Evidentiary Hearing, Mr. Brinkman testified that the changes between Pl.'s Ex. P1 and Pl.'s Ex. P7 are as follows:  the new channel is twenty percent wider than the original one and is also almost double in height; the aluminum used for the walls of the gate arm is less thick, that

is, lighter; the opening for the LED strip's light is wider so that more light can escape from the channel; and the retaining fins are inside the channel and reflect light.   Mr. Pikman testified regarding the changes between the two products as follows:  in Pl.'s Ex. P7, the channel is recessed deeper into the gate arm and it is a "C"-shaped channel rather than a "U" shaped channel (as seen from the side of the gate arm), all of which create better visibility for drivers.

On the other hand, Dr. Rice opined that there is not a significant difference between the design represented by Pl.'s Ex. P1 and Pl.'s Ex. P7.  Dr. Rice further opined that Defendants' new design is the same as their original design and that the only difference between them is that the gate arm's upper and lower side walls have been shifted slightly inward.  See Ex. P-Demonstrative (red and blue markings on old and new designs).  However, Dr. Tifton found Dr. Rice's analysis to be flawed due to his use of both a blue line and a red line to identify the same component. According to Dr. Tifton, one thing cannot be two things.  In other words, the part called the "lip" or "fin" could not be both the outer side wall and the channel.  The undersigned agrees that Dr. Rice's approach is flawed and contrary to common sense.  Hence, the undersigned rejects Dr. Rice's contorted attempt to show that the old and new design are the same, with the only difference being that the gate arm's upper and lower side walls have been shifted slightly inward.

Rather, the undersigned accepts Mr. Brinkman's and Mr. Pikman's characterization of Pl.'s Ex. P7 as having a recessed channel to hold the LED light strip, with the channel being "C"-shaped rather than "U"-shaped.  This makes the fins or lips in Pl.'s Ex. P7 part of the channel rather than part of the upper and lower side walls as in Pl.'s Ex. P1.  Notably, this comparison accurately reflects the Court's claims construction for the claims that Plaintiff contends were infringed by Pl.'s Ex. P1:

| "first upper sidewall including a terminating end" | The upper half of the first side surface, extending from the convex top to its terminal end located in the first opening. |
|---|---|
| "first lower sidewall including a terminating end" | The lower half of the first side surface, extending from the convex bottom to its terminal end located in the first opening. |

See Order Granting Unopposed Motion to Amend [D.E. 101]. Therefore, the undersigned concludes that there is more than a colorable difference between Pl.'s Ex. P7 and Pl.'s Ex. P1.

Plaintiff also argues that the colorable differences test is met pursuant to the "doctrine of equivalence " because Defendants' "'new' gate arm 'do[es] the same work in substantially the same way, and accomplish[es] substantially the same result' as the enjoined gate arm, making the two 'the same.'" See Plaintiff's Proposed Findings of Fact and Conclusions of Law [D.E. 195 at 29] (citing KSM Fastening Sys. Inc. v. H.A. Jones Co., Inc., 776 F.2d 1522, 1527 (Fed. Cir. 1985)). Plaintiff relies for this argument on Dr. Rice's testimony that "the lip or the terminal end on both designs serves to retain the LED light strip within the channel. And, so they both function in an identical manner there is no difference. The only difference is the terminal end has been shifted slightly inward. But it still serves exactly the same function in exactly the same manner." See 5/13/19 Transcript [D.E. 180 at 79]. However, the undersigned has rejected Dr. Rice's approach as flawed and contrary to common sense. Therefore, the factual premise for Plaintiff's reliance on the doctrine of equivalences fails.

Plaintiff further argues that recessing the channel deeper into the gate arm in Pl.'s Ex. P7 was nothing more than an "obvious" modification to Pl.'s P1 and that "in reference to the obviousness analysis in a contempt proceeding . . . the inquiry is whether the specific modification is an obvious modification." See Plaintiff's Proposed Findings of Fact and Conclusions of Law [D.E. 195 at 30] (citing TiVo, 646 F.3d at 882 n.1). In support of this argument, Plaintiff refers to "obviousness" comments made by the USPTO examiner in the course of rejecting the '782 Patent

32

Application at various stages of the prosecution history, which, according to Plaintiff, were never withdrawn or reversed by the USPTO examiner or disputed by Mr. Pikman.  Id.[21]  However, Plaintiff's obviousness argument is unpersuasive for two reasons.  First, in its paraphrasing of the TiVo passage upon which it relies, Plaintiff omitted the following language: "We do not suggest that the law on obviousness is binding in contempt proceedings."  TiVo, 646 F.3d at 882 n.1. Second, Plaintiff does not explain how selected portions of the prosecution histories suffice to transmute the USPTO examiner's comments into an admission of obviousness by Mr. Pikman. Therefore, Plaintiff's "obviousness" argument also fails.

Finally, Plaintiff characterizes BlackSky's emails to its customers regarding the new gate arm (Pl.'s Ex. P8) as admissions that Defendants' new product was not significantly different from their original product.  According to Mr. Brinkman, the purpose of the emails was to inform BlackSky's distributors of the modifications to the LED barrier gate arm, which were related to the shape of the aluminum and to the light coming out.  However, the emails did not discuss the modifications; they simply said a consent decree had been agreed upon.  While acknowledging the statement that the outward visual appearance of the gate arm's new design would be virtually identical to the original one, Mr. Brinkman characterized it as a marketing message intended to calm the customers' nerves.  Given this contextual explanation, which the undersigned finds to be credible, the emails do not rise to the level of technical admissions for purposes of the colorable differences inquiry.

---

[21]  Specifically, Plaintiff references its proposed factual findings at paragraphs 57, 60, 63, 66, 68 (citing portions of the '782 Patent Application's and the '195 Patent Application's prosecution histories found at Pl.'s Exs. P35, P36, P38, P39, P40); and its proposed factual findings at paragraphs 59, 61, 65, 67, 70, 72 (citing portions of the '782 Patent Application's and the '195 Patent Application's prosecution histories found at Pl.'s Exs. P43, P44, P47, P49, P50, P51).

Based on the foregoing, the undersigned concludes that Plaintiff has not met its burden of showing by clear and convincing evidence that Pl.'s Ex. P1 and Pl.'s Ex. 7 are no more than colorably different.  TiVo, 646 F.3d at 881-83.  Accordingly, the second step in the analysis, consisting of the infringement inquiry, becomes irrelevant.  Id. at 882.  Nevertheless, for the sake of completeness, the undersigned addresses the infringement prong below.

### 2.  *The Infringement Inquiry*

TiVo teaches that, "when a court concludes that there are no more than colorable differences between the adjudged infringing product and modified product, a finding that the newly accused product continues to infringe the relevant claims is additionally essential for a violation of an injunction against infringement."  646 F.3d at 883.  In conducting the required infringement analysis, "the court is required to evaluate the modified elements of the newly accused product against the asserted claim, on a limitation by limitation basis, to ensure that each limitation continues to be met[;]" and the "court is bound by any prior claim construction that it had performed in the case."  Id.

Defendants contend that, "[i]n this case, there was no prior finding of infringement," and that the Consent Decree and the Settlement Agreement each only contain "an agreement on validity, not infringement."  See Defendants' Proposed Findings of Fact and Conclusions of Law [D.E. 194-1 at 37].  Plaintiff argues that, as a result of its Disclosure of Asserted Claims and Infringement Contentions (Pl.'s Ex. P41, Exhibit A), Defendants' Non-Infringement, Unenforceability, and Invalidity Contentions (Pl.'s Ex. P29) and the Consent Decree (Pl.'s Ex. P4), Pl.'s Ex. P1 "is *admitted* as having infringed as alleged, and that admission substitutes as the [required] 'finding of infringement.'".  See Plaintiff's Proposed Findings of Fact and Conclusions

of Law [D.E. 195 at 26] (citing <u>KSM</u>, 776 F.2d at 1529).  In <u>KSM</u>, the Federal Circuit stated that,

in cases involving a consent decree,

> an adjudged device conceivably could have been found *not* to fall within the scope
> of the claims upon a full trial. Nevertheless, such a device is an admitted
> infringement, and the claims of the patent may be construed in light of that
> admission when the court undertakes to determine whether a modified device is
> also an infringement in contempt proceedings.

776 F.2d at 1529.

The undersigned accepts Plaintiff's argument and deems infringement admitted by virtue

of the Consent Decree only for the purpose of conducting the infringement prong analysis and

limited to Plaintiff's two claims that were construed at the *Markman* hearing:

| "first upper sidewall including a terminating end" | The upper half of the first side surface, extending from the convex top to its terminal end located in the first opening. |
|---|---|
| "first lower sidewall including a terminating end" | The lower half of the first side surface, extending from the convex bottom to its terminal end located in the first opening. |

<u>See</u> Order Granting Unopposed Motion to Amend [D.E. 101].

As discussed *supra*, the undersigned accepts Mr. Brinkman's and Mr. Pikman's

differentiation of Pl.'s Ex. P1 from Pl.'s Ex. P7 as the latter having a recessed channel to hold the

LED light strip, with the channel being "C"-shaped rather than "U"-shaped, which makes the fins

or lips in Pl.'s Ex. P7 part of the channel rather than part of the upper and lower side walls as in

Pl.'s Ex. P1.  Based on this assessment, the relevant claims limitations in Plaintiff's patents, as

explained by the Court's claims construction, do not continue to be met by Pl.'s Ex. P7.  Hence,

Plaintiff has not satisfied the infringement prong of the contempt analysis by clear and convincing

evidence.  <u>TiVo</u>, 646 F.3d at 883.

## CONCLUSION

Based on the foregoing considerations, the undersigned RESPECTFULLY RECOMMENDS that the Motion to Reopen be GRANTED *nunc pro tunc* April 19, 2017; and that the Motion for Contempt and the Motion to Enforce be DENIED.

The parties have **fourteen (14) days** from the date of receipt of this Report and Recommendation within which to serve and file objections, if any, with the Honorable Robert N. Scola, Jr., United States District Judge.  See Local Magistrate Rule 4(b).  Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained herein.  See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).  Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions."  See 11th Cir. R. 3-1 (I.O.P. - 3).

RESPECTFULLY SUBMITTED in Chambers at Miami, Florida, this 30th day of April, 2020.

_____
ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE


cc:     United States District Judge Robert N. Scola, Jr.
        Counsel of Record